IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 7, 2021

**STATE OF TENNESSEE v. JACOBE LAMONE SNIPES**

**Appeal from the Circuit Court for Madison County
No. 19-917     Roy B. Morgan, Jr., Judge**

---

**No. W2020-00916-CCA-R3-CD**

---

The defendant, Jacobe Lamone Snipes, appeals his Madison County Circuit Court jury convictions of attempted first degree murder, aggravated assault, employing a firearm during the commission of a dangerous felony, and two counts of gang enhancement, arguing that the trial court erred by admitting certain evidence and that the evidence was insufficient to support his convictions.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and JILL BARTEE AYERS, JJ., joined.

John P. McNeil, Memphis, Tennessee (at trial and on appeal); and Daniel Taylor, Jackson, Tennessee (at hearing), for the appellant, Jacobe Lamone Snipes.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Bradley F. Champine, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Madison County Grand Jury charged the defendant with one count each of attempted first degree murder, aggravated assault, and employing a firearm during the commission of a dangerous felony and two counts of gang enhancement.

At the February 26, 2020 trial, Lloyd Springfield, the owner of Affordable Funerals & Cremation Services at 116 Allen Avenue in Jackson, testified that he had five security cameras around the property.  He provided the police a copy of the video footage from January 10, 2019.

Samuel Nasr, the owner of the Hays Food Express at 405 North Hays Avenue in Jackson, testified that he had 16 security cameras around his property and that he provided the police with a copy of the security footage from January 10, 2019. On cross-examination, Mr. Nasr said that three of the security cameras are outside of the building.

James Duncan Maness, an assistant branch manager at Enterprise Rent-A-Car in Jackson, testified that Enterprise maintained records of all rental agreements. He identified a rental agreement for Jamaine Tipler that indicated that Mr. Tipler rented a Chevrolet Malibu in December 2018 and exchanged that vehicle for a Chevrolet Silverado on January 10, 2019. On January 11, Mr. Tipler exchanged the Silverado for a Nissan Rogue.

Darren Harris, the victim in this case, testified that the defendant shot him on January 10, 2019. He acknowledged that at that time, he was a member of the Unknown Vice Lord set of the Vice Lord street gang. The Unknown Vice Lords were also known as the Ghost Mob Vice Lords ("Ghost Mob"). Mr. Harris said that he had been affiliated with the gang for approximately 10 years before the shooting.

Mr. Harris testified that "Big Pokey" was the leader of the Ghost Mob. Mr. Harris was a friend of Big Pokey and looked up to and admired him. Leading up to January 10, 2019, Mr. Harris had determined that "it was time for me to" leave the Ghost Mob because "I wanted . . . my life back," noting that it had been "just too much of my life that I had given away." He also said that he did not want his affiliation with the gang "to end up trickling down to my kids." As he considered leaving the Ghost Mob, Mr. Harris began associating with the Traveling Vice Lords ("Travelers"), another set of the Vice Lord gang and the gang with which his brother had been a member. Mr. Harris told Big Pokey that he wanted to leave the Ghost Mob, and Big Pokey "was okay" with his choice.

On January 10, 2019, Mr. Harris worked his job at a Captain D's, and when his shift ended, he received a text message from an unknown number "saying that Big Pokey had . . . got killed." Mr. Harris called the number and the person who answered identified himself as "Twin Gatti," another member of the Ghost Mob, and Mr. Harris asked him whether Big Pokey was actually deceased. Twin Gatti told him to read the text, stating, "It's what it said." Mr. Harris said that he asked Twin Gatti what had happened to Big Pokey, to which Twin Gatti replied, "All we been told is, if you're not Ghost, then you gotta get it." Mr. Harris took the statement to be a threat, and, scared for his life, he took his "daughter away from [his] apartment" and "took her to her mother," Jaden Moses. He also began "looking for me a gun to protect myself."

While driving his daughter to Ms. Moses's house, Mr. Harris passed Mr. Tipler, who was driving a "red Chevy Silverado." Mr. Harris knew Mr. Tipler, who went

by the nickname "Ghost Man," to be a member of the Ghost Mob. The men "stopped in the middle of the street" with their driver's side doors facing each other and talked about Big Pokey's death. The defendant, whom Mr. Harris knew to be a member of the Ghost Mob, was in the vehicle with Mr. Tipler. At the end of the conversation, Mr. Tipler said to Mr. Harris, "I heard that you converted," which term Mr. Harris explained was used to indicate a change in gang affiliation. Mr. Harris said that he had not told Mr. Tipler about his intention to leave the Ghost Mob or to affiliate with the Travelers. Mr. Harris denied to Mr. Tipler that he had converted because "I felt like I had got threatened anyway because what he said to me was that the [Travelers] was supposed to had killed Big Pokey. Now he trying to say that I'm [Travelers]. So that mean, you gonna want to do something to me." Mr. Tipler turned his truck around so that the defendant, who was in the passenger's seat, was facing Mr. Harris. The men did not say anything else, but the defendant turned to look at Mr. Tipler and said something, and "they pulled off after that." Mr. Harris could not hear what the men said to each other.

Mr. Harris dropped his daughter off at Ms. Moses's house, and as he was driving, he saw the same red Silverado truck following him "everywhere I went" for "at least an hour." Mr. Harris drove to an apartment complex off of F.E. Wright Drive where he talked with a friend, also a member of the Ghost Mob, for 20 to 30 minutes. The Silverado did not follow him into the apartment complex. After running another errand, Mr. Harris went to Hays Food Express, and Mr. Tipler and the defendant "[p]ulled right up beside me" in the red Silverado. At that time, the defendant's sister, Braxton Snipes was driving the truck, Mr. Tipler was in the passenger's seat, and the defendant was in the back. Mr. Tipler "came over to my car and talked to me"; he "was like halfway in my car, but he didn't full get in and close the door. He wanted to know did I have a gun on me." Mr. Tipler indicated that certain members of the Crips gang were in Mr. Harris's neighborhood and that "he didn't want nothing to happen to me." Mr. Harris told him that he did not have a gun, and Mr. Tipler told the defendant "to secure me to my house." The defendant got into Mr. Harris's car and told Mr. Harris that he wanted to "play Madden at my house." Mr. Harris said that he and the defendant had played Madden before and that it was not an unusual request.

Mr. Harris drove the defendant to Mr. Harris's apartment at 124 Allen Avenue in Jackson. Mr. Harris walked into his apartment, and the defendant followed behind him. Mr. Harris heard the defendant say, "'I got you now, n***a.'" Mr. Harris remembered feeling heat "[o]n the side of my face," and as he "bent down with my hands on my knees," he "noticed that [he] couldn't open" his right eye. Mr. Harris realized that he had been shot. Mr. Harris said that he had no memory beyond that point but assumed that he had "lost consciousness . . . but I just kept moving" based on a trail of blood in his apartment leading from the back door to the upstairs. The next thing Mr. Harris remembered was waking up five days later at Regional One hospital in Memphis. He said

that one bullet entered near his eye and exited "through my forehead," causing an orbital fracture and that as a result, he was blind in his right eye. He was also shot in his head, neck, back, arms, leg, and penis. Although Mr. Harris could not remember what had happened to him when he first woke up, over time, his memory returned. He said that, initially, he did not tell the police what he remembered because he intended to get revenge on the defendant; however, because he had decided to "turn my life in the right direction," he eventually told the police what he remembered.

Mr. Harris acknowledged that he was incarcerated at the time of the trial for driving on a revoked or suspended license and said that before the trial began, Mr. Harris saw the defendant, who had said to him, "'I did that.'"

During cross-examination, Mr. Harris testified that the defendant had spoken to him when they were each being escorted through the jail. He said that the defendant "smiled, looked at me and touched his forehead and said, 'I did that.'" Mr. Harris denied that he was affiliated with any gang at the time of trial. He said that he had told his brother about his intention of leaving the gang and that his brother did not take issue with Mr. Harris's decision "because you can't be forced to be anything. If I wake up one day and say, I'm done being a Vice Lord, that's my right." He speculated that the defendant shot him "[b]ecause from what I understand, it was a rumor started that I converted from one set to another." He believed that the incident was related to the shooting death of Big Pokey. He explained that because it was rumored that Big Pokey was killed by the Travelers and because Mr. Harris was rumored to have converted to the Travelers, the Ghost Mob had him shot because he was an easy target for revenge.

Mr. Harris said that on the day of the shooting, he saw two men that he knew as "Little Charles" and "Twin Gatti" at the Captain D's where Mr. Harris worked. That was the first time that he had met Twin Gatti, and they exchanged telephone numbers, but Mr. Harris did not save Twin Gatti's number in his cellular telephone. Mr. Harris left his shift at Captain D's between 12:00 p.m. and 1:00 p.m., at which point he looked into having his daughter enrolled in daycare and then went home and did laundry. Later that day, Mr. Harris received a text message about Big Pokey's death from an unknown number. He called the number, which he learned belonged to Twin Gatti. During that call, Twin Gatti told him, "'If you're not Ghost, you gotta get it.'" Mr. Harris asked to speak to Little Charles, who told him "'Man, bro, I can't even talk'" and hung up. Based on that telephone call, Mr. Harris believed that he was in danger and "had to hurry up and get [his daughter] away from there." He believed that he was being targeted as revenge by the Ghost Mob for Big Pokey's death.

Mr. Harris said that he saw Mr. Tipler driving the red Silverado at approximately 3:30 or 4:00 p.m. on January 10, as he was driving his daughter to Ms.

-4-

Moses's house. He acknowledged that he honked his horn to get Mr. Tipler's attention. Mr. Harris said that when he noticed later that the red Silverado was following him, he drove to the home of a man known as "Fifty," also a member of the Ghost Mob, "to see was they gonna follow me over there." The truck did not follow him, and he left Fifty's approximately a half hour later. He said that he drove to a friend's house and then to the Hays Food Express where he again saw the red Silverado. He clarified that the truck was already at the store when he arrived. He denied that he invited the defendant to his house, saying, "He was told to ride with me." Mr. Harris acknowledged that other members of his family had suspected that he had been shot by Ms. Moses, but he dismissed that suspicion, stating, "[S]he don't even touch guns." Mr. Harris denied that he knew anyone named Destinee Cole or Jada Banks.

Kenneth Shell, who worked as a patrol officer with the Jackson Police Department ("JPD") in January 2019, testified that he responded to 124 Allen Street to a report of an "unconscious male bleeding in the area." When he arrived, "Mr. Harris was on the back seat, laying on the back seat of a vehicle at that time" and appeared to have "two gunshot wounds to the upper body area." An ambulance arrived and transported Mr. Harris to the hospital, at which time Officer Shell secured the scene until other officers arrived.

On cross-examination, Officer Shell testified that he did not "really go inside the house at that time. I was mainly on the outside." He said that he spoke with Mr. Harris's brother and Ms. Moses at the scene. He also got a statement from a witness who said that they had "observed a male running from the area of Mr. Harris'[s] residence."

Keven Lee Mooney, an investigator with the JPD, testified that he and Investigator Kyle Hamilton responded to Mr. Harris's apartment. When they arrived, Mr. Harris had already been transported to the hospital, and they photographed and collected evidence from the scene. The photographs that Investigator Mooney took at the scene were exhibited to his testimony. At Mr. Harris's apartment, he found a spent shell casing on the threshold of the back door, leading into the kitchen. He also found "[c]asings . . . scattered about" the kitchen. One bullet "went through the table," another was "recovered . . . out of the refrigerator," and a third was recovered from a drawer. A blood trail in the apartment "seemed to be going from the kitchen to the bathroom," which was located on the second floor. Some blood spots on the stairs appeared to be "watered-down blood." A chair in the living room had "a large area of blood and water." Investigator Mooney said that it appeared that Mr. Harris had tried to shower after he had been shot, noting that "the shower was still on when we got there, running. The clothes were wet. There was watery blood like splashed on the sink and edge of the tub and then back down the stairs." Investigator Mooney had collected the clothing found in the bathroom, including a black hoodie with holes in it that was found "inside out like it was peeled off." The hoodie had what appeared

to be blood on it. The following day, Investigator Mooney responded to the Enterprise on the Highway 45 Bypass, processed the red Silverado truck, and collected latent fingerprints from the driver's door.

During cross-examination, Investigator Mooney testified that he collected two cellular telephones from Mr. Harris's apartment, both of which were found in "the upper cabinet" in the kitchen. He also collected fingerprints from the victim's vehicle.

JPD Investigator Joseph Williams testified that he served as the lead investigator in this case. Through the course of the investigation, he developed two suspects: the defendant and Mr. Tipler. He collected video footage recorded by JPD "pole cameras," which Investigator Williams described as "a camera at the top of a telephone pole" that the JPD had "across the city of Jackson" to "capture[] video and surveillance from different areas in the City of Jackson." The pole cameras were on at all times. JPD officers were able to view the footage of the pole cameras in real time and officers in a control room were able to change the orientation of the cameras to get a different view. One of the pole cameras recorded the area near Mr. Harris's apartment, and Investigator Williams collected the footage from that camera. The jury viewed the footage, which showed a red Silverado truck turn down the street next to the apartment at 5:46 p.m. One minute later, Mr. Harris's blue Mustang can be seen turning down the same street. At 5:48 p.m., the red truck can be seen driving down the street again traveling in the same direction as two minutes prior. Investigator Williams explained that the roads around Mr. Harris's apartment made a complete circuit around the block. He estimated that the shooting occurred at 5:49 p.m. The red truck passed by the apartment again at 5:50 p.m., 6:02 p.m., 6:06 p.m., 6:09 p.m., and 6:22 p.m. Investigator Williams said that he viewed this video footage the night of the shooting, which led him to suspect that the red truck was connected to the shooting. He also collected security camera footage from Affordable Funeral & Cremation Services and the Hays Food Express.

The jury viewed portions of the video from the funeral home, and Investigator Williams described the events depicted on the video. The red Silverado could be seen circling the block, and Mr. Harris's car could be seen arriving at his apartment. The video showed "two individuals walk from the area of Darren Harris'[s] car and then walk to the rear door of Darren Harris'[s] apartment." One of the individuals was walking behind the other "in the same direction." The door to Mr. Harris's apartment opened and "just as it appear[ed] that the individuals went inside there," "something lights up," and "the same subject that was walking behind Mr. Darren Harris exit[ed] the apartment and appear[ed] to be crouching down running in an east direction alongside the apartment building." Approximately one-and-a-half minutes later, the red truck turned "into an empty parking lot directly across the street from the apartment building," where it stayed for "several minutes" before circling the block "several more times." Investigator Williams

-6-

said that the flash of light seen on the video was consistent with a muzzle flash.

The jury viewed a portion of the video footage from the Hays Food Express, which showed the red Silverado enter the parking lot at 5:41 p.m. and drive to the front of the store. Mr. Harris's blue Mustang can be seen along the building and the two vehicles "park beside each other for approximately three minutes" in a location that is not captured on video.

Investigator Williams said that when Mr. Harris viewed the video footage, Mr. Harris remembered having talked to Mr. Tipler and the defendant in the truck at the Hays Food Express. Investigator Williams denied suggesting to Mr. Harris that the defendant was a suspect or that the red truck seen on the video was involved.

During cross-examination, Investigator Williams described further footage from the funeral home that showed a person approaching the door to Mr. Harris's apartment at 6:01 p.m. He explained that from the pole camera footage, two people could be seen approaching the door but said that neither person entered the apartment. Investigator Williams said that he believed one of the people seen at the apartment door was Mr. Harris's brother, who had told him that he had gone to the apartment but "couldn't get anybody to answer the door." He said that the video footage from the Hays Food Express showed "a shadow that appears to go from one" of the vehicles "to the other" but that it was unclear whether anyone entered Mr. Harris's vehicle. He estimated that the Hays Food Express was one-and-a-half to two miles from Mr. Harris's apartment.

Investigator Williams acknowledged that none of the video footage captured the license plate of the red Silverado and that neither the driver nor any passengers could be seen on the videos. Investigator Williams said that he believed it to be the same truck rented to Mr. Tipler because it appeared "to be identical as far as the looks, the front end, the grille," and the wheels. He acknowledged that he did not attempt to question Mr. Tipler, explaining, "I don't have any way of getting in touch with Mr. Tipler." He was aware of a "domestic history" between Mr. Harris and Ms. Moses but denied that Ms. Moses was ever a suspect in this case. Investigator Williams said that when Mr. Harris viewed the video footage of him arriving at his apartment he noted that it was unusual for him to park where he did because he "always park[ed] closer to his apartment."

Lashonda Perry, who worked in fingerprint identification at the Madison County Sheriff's Department, testified that she collected the defendant's fingerprints on May 6, 2019, as he was booked into the jail.

Madison County Officer Ted Maxwell, an investigator with the Madison County Sheriff's Department, testified that all telephone calls placed by an inmate were

recorded. He reviewed telephone calls placed by the defendant on August 2 and 5, 2019. He said that immediately before trial, the defendant and Mr. Harris were held in cells directly across from each other and that the two cells had windows to the hallway, through which it was possible to see from one cell to the other. Investigator Maxwell said that the security camera in the hallway between the two cells could not view the inside of either cell. He also said that a deputy was not present the entire time that the two men were in those cells.

Mark Reeves testified that he escorted the defendant from his cell to the court room at the beginning of the trial. He said that when he approached the defendant's cell, he noticed that Mr. Harris, in the cell directly across from the defendant, "was both physically and verbally upset." Mr. Harris was "[v]ery vocal, walking, pacing back and forth from the door back in the cell, but very verbal." The defendant, on the other hand, "seemed calmed." Deputy Reeves testified that jail personnel were not always present and monitoring that area. He acknowledged that the defendant and Mr. Harris could have talked to each other before he arrived to escort the defendant to trial.

During cross-examination, Deputy Reeves testified that, although Mr. Harris did not speak directly to him, Mr. Harris "was just very vocal, very verbal, as if something had happened." He explained that the doors to each cell had "a glass in the middle about head level, and then there's a glass in between those two doors. So they can see each other very well."

Aimee Oxley, the director of the property and evidence unit and a crime scene analyst and latent fingerprint examiner for the JPD, testified as an expert in latent fingerprint identification. She determined that the fingerprints taken from the Silverado belonged to the defendant.

During cross-examination, Officer Oxley testified that she received nine prints from the red Silverado. She also processed one fingerprint from the blue Mustang and determined that it belonged to Mr. Harris. Officer Oxley submitted all of the fingerprints collected in this case to a national database, which returned matches to the defendant, Mr. Harris, and a Lewis Dotson; Mr. Tipler was not identified as a potential contributor of any of the fingerprints.

Ashley Robertson, an investigator in the gang enforcement team for the JPD, testified as an expert on the Vice Lord street gang. He said that he had conducted specialized investigations into the Vice Lords since 2011 and was familiar with "most of" the members of the Ghost Mob and Travelers in Jackson. Investigator Robertson explained that the Vice Lords were a nationwide street gang that consisted of "multiple sets." He confirmed that the Ghost Mob was also known as the Unknown Vice Lords and had

"national and regional branches of power starting with kings" at the national level. The ranks at the regional levels included chief and chief of chiefs; he said that Big Pokey was a chief of chiefs. At the local level, "the rank structure would be your universal elites," including "a 5UE, . . . a 3UE, and then it goes down to a 5 Branch Elite and a 3 Branch Elite, and then you have your soldiers." Investigator Robertson said that although the different sets, such as the Ghost Mob and the Travelers, "fall under the umbrella of the Almighty Vice Lord Nation," they do not "associate together" or act as allies except "in time of war with other gangs outside of" the Vice Lords and that, ordinarily, the sets were often at war with each other.

Investigator Robertson was aware of ongoing tension between the Ghost Mob and the Travelers. He said that Big Pokey, whose real name was Ronald Terry, was "considered the chief of chiefs" of the Ghost Mob, a rank to which "he would have had to been appointed . . . by the king in Chicago." Mr. Terry had a "very high ranking" and "would have been over the southeastern region of the United States" at the time of his death. A certified death certificate indicated that Mr. Terry died on January 10, 2019.

Investigator Robertson said that Mr. Harris, the defendant, and Mr. Tipler were all members of the Ghost Mob in January 2019. He explained that the Ghost Mob "have their own hand sign," "which is a 'G,' and their writings, especially on social media, whenever they write something, the 'G' will always be capitalized." They also would "use the ghost emojis on text messages, [and] the five-point star." Investigator Robertson said that "the Vice Lord colors are red, black and gold" and that the Ghost Mob would "have red bandannas, wear certain sports apparel that correlates with the colors of their gang." He continued: "Certain tattoos help distinguish gang membership, and a lot of times, social media has been beneficial to us in helping to classify gang members." In his investigation of the defendant, Investigator Robertson found that the defendant's social media posts had "multiple pictures of him throwing" the Ghost Mob hand sign and multiple uses of "the ghost emoji" and "the five-point star emoji."

Investigator Robertson testified that on January 22, 2019, he effectuated a traffic stop during which the defendant was arrested on driving charges. The defendant's mother was present at the scene and talked to Investigator Robertson, telling him that she understood that the defendant needed "to leave the gang life alone" and that "she was upset that T-Ghost put him down when he was 15." Investigator Robertson said that T-Ghost was the nickname of Terry Thompson, a known Ghost Mob member. The defendant was known to associate with Mr. Thompson and other Ghost Mob members and had "two five-point crown tattoos on his body." Investigator Robertson testified that another member of the Ghost Mob, Eric Wise, was known to associate with the defendant and was present on the first day of the defendant's trial. Investigator Robertson reviewed several recorded telephone calls that the defendant placed from jail, in which the defendant had said: "'I'm

chilling, jailing and VL-ing'" and "'[c]hilling and VL-ing.'" Investigator Robertson explained that "VL-ing" meant "Vice Lording," a phrase commonly used by the Vice Lords to "[j]ust show[] their membership in the Vice Lord gang."

Investigator Robertson confirmed that the Ghost Mob suspected the Travelers of being responsible for Big Pokey's murder. On January 10, a confidential informant called Investigator Robertson and reported "that the Ghost Mobs were going to push on the [Travelers], which means go after, shoot, assault or whatever." Investigator Robertson said that he reported this information to his supervisor but "before me and the guys on my unit could make it back into work, Mr. Harris had already been shot."

During cross-examination, Investigator Robertson testified that at the time of Big Pokey's death, he had suspected that Mr. Harris "was in attempts to . . . transition" to the Travelers from the Ghost Mob. His suspicions were based on social media postings that included photographs of Mr. Harris with members of the Travelers, but Investigator Robertson said that because Mr. Harris's brother was a Traveler, "I can't say whether he was trying to make the transition or if he was just taking a photo with his brother and his brother's guys."

The State rested. After a *Momon* colloquy, the defendant elected not to testify but chose to put on proof.

Destinee Cole testified that she had known Mr. Harris since she was a young teenager and that she knew him "very well." She knew Mr. Harris to be "affiliated with Ghost Mob." She said that she had talked to Mr. Harris after the shooting via Facebook messages and that Mr. Harris expressed that he "was just glad that he was alive" but otherwise did not discuss the shooting. Ms. Cole said that she knew that Cornelius Fields, also known as "Cornbread," had been at Mr. Harris's house on the day of the shooting and had not left until sometime "after dark."

During cross-examination, Ms. Cole acknowledged that she was not present at Mr. Harris's house at anytime on the day of the shooting. She clarified that she believed Mr. Fields to be at Mr. Harris's house that day based on photographs that she had seen on Facebook.

Jada Banks testified that she had met Mr. Harris while she was a student at Lane College. She said that she "met him because of my . . . becoming [Ghost Mob], and he was kind of my mentor and [was] to guide me to be a sister." She explained that she wanted to join the Ghost Mob because "being young, whatever, . . . just family situations and, you know, being alone at school, so I feel like I needed to belong." Ms. Banks said that before the shooting, she had heard the rumor that Mr. Harris was affiliating with the

Travelers but that she did not know that to be true. She said that she had talked to Mr. Harris since the shooting, once in late January or early February, when Mr. Harris told her that he "didn't really remember much" about the shooting. She spoke to him again in April, when Mr. Harris "asked me had I seen the news" and told her that the person who had shot him "was not here anymore." Ms. Banks said that because she "never became an official sister" of the Ghost Mob, she did not ask Mr. Harris any more questions. Ms. Banks said that she knew of Mr. Fields and knew him to be a Traveler. She said that Mr. Fields had died before her April 2019 conversation with Mr. Harris.

On cross-examination, Ms. Cole acknowledged that she never told law enforcement officers that Mr. Harris had indicated that the person who shot him was deceased.

The defendant rested, and the State presented rebuttal proof.

On rebuttal, the State recalled Mr. Harris, who maintained that he did not know Ms. Cole or Ms. Banks. He denied that he ever told anyone that someone other than the defendant had shot him. He said that immediately after the shooting, he did not remember the incident or who had shot him. He again acknowledged that, as his memory returned, he did not immediately tell the police what he remembered. He maintained that he eventually told the police everything that he remembered and said that he had never changed his story.

During cross-examination, Mr. Harris acknowledged that he used to have a Facebook account under the name "Darceil King." He reiterated that he did not know Ms. Cole or Ms. Banks.

On redirect-examination, Mr. Harris said that he knew many people only by their nickname. He acknowledged that it was possible that he knew Ms. Cole or Ms. Banks by a nickname.

On recross-examination, Mr. Harris identified a photograph of Ms. Cole, saying that he recognized her image and that "[w]hen I first moved to Jackson, she was going to the same church as me." He said that he did not believe that he had ever had a conversation with Ms. Cole over Facebook.

On further redirect examination, Mr. Harris acknowledged that there were "[p]robably" people with whom he interacted on Facebook that he would recognize but not know their name.

The State recalled Investigator Robertson who testified that Mr. Tipler was

-11-

a suspect in the investigation of this case. He noted that Mr. Tipler was a "leader of this area" within the Ghost Mob.

During cross-examination, Investigator Robertson acknowledged that Mr. Tipler could be charged for the same offenses as the defendant in this case.

The jury accredited the State's evidence and convicted the defendant as charged on Counts 1 through 3. The trial continued as to the gang enhancement charges, Counts 4 and 5.

The State recalled Investigator Robertson, who testified that he knew the defendant to be a member of the Ghost Mob gang. He said that the defendant's referencing "VL-ing" on a recorded telephone call from the jail was the defendant's "claiming ownership of the Vice Lord gang." He said that the defendant's mother had also identified the defendant as a gang member as did a confidential informant. Investigator Robertson had investigated the defendant for gang-related offenses in other cases and said that the defendant, along with other Vice Lord gang members, had been arrested for attempted murder in another case. Additionally, Investigator Robertson knew the defendant to associate with other known members of the Ghost Mob. Investigator Robertson identified photographs from Facebook of the defendant's using the Ghost Mob hand sign. He said that the Ghost Mob was engaged in a pattern of criminal gang activity.

The State rested, and the defendant opted to present no proof related to Counts 4 and 5 of the indictment.

The jury found the defendant guilty of the criminal gang offenses as charged, and the trial court merged the criminal gang enhancement convictions with the convictions of attempted first degree murder and aggravated assault. After a sentencing hearing, the trial court imposed an effective 26-year sentence. The defendant filed a timely but unsuccessful motion for a new trial followed by a timely notice of appeal.

In this appeal, the defendant argues that the trial court erred by admitting certain evidence in contravention of Evidence Rule 404(b) and that the evidence was insufficient to support his convictions.

*I. Evidence Rule 404(b)*

The defendant contends that the trial court erred by admitting into evidence: 1) Mr. Harris's testimony that Twin Gatti said to him, "If you're not Ghost, then you gotta get it"; 2) Investigator Robertson's testimony that the defendant's mother indicated that the defendant was in a gang, that the defendant was arrested for a driving violation, that the

defendant associated with an incarcerated gang member, and that a gang member had been present in the courtroom; and 3) Investigator Robertson's testimony regarding Mr. Terry's death. The defendant argues that this evidence was inadmissible under Rule 404(b).[1] The State asserts that the trial court did not err.

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Tenn. R. Evid. 404(b). Before such evidence may be admitted, however, the following procedure must be followed:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

*Id.* When the trial court substantially complies with the procedural requirements of Rule 404(b), this court will overturn the trial court's ruling only when there has been an abuse of discretion. *See State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *see also DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). If, however, the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *See id.*

Important to this case, "[e]vidence of other crimes, wrongs, or acts" committed by someone other than the defendant is not prohibited by Rule 404(b). *See* Tenn. R. Evid. 404(b); *State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002) ("It is well established that in a criminal trial, evidence of a *defendant's* prior misconduct is inadmissible to establish the accused's bad character or criminal propensity.") (citations omitted)); *State v. DuBose*, 953 S.W.2d at 653 ("Evidence of crimes, wrongs or acts, if

---

[1] The State filed a motion in limine to seek admission of the challenged evidence, in which motion the State also argued that the evidence was admissible under the hearsay rules, but the defendant does not raise a hearsay argument on appeal.

relevant, are not excluded by Rule 404(b) if they were committed by a person other than the accused . . . .")

Here, the State filed a motion in limine seeking admission of the challenged evidence, and the trial court held a hearing on the motion on January 13, 2020. At the close of the hearing, the trial court made findings on the record and issued a written order granting the State's motion. The trial court found that the evidence proffered by the State was relevant to show the defendant's motive and that the probative value of the evidence "significantly outweigh[ed] the prejudicial effect." The court noted that Investigator Robertson's testimony regarding gang activity would be limited based on his "training, experience and particularized knowledge with respect to things like the existence of the Vice Lords, their symbols and sets, identification of the victim and defendant as members, and corroborating the victim's testimony." The trial court also noted that it would give a limiting instruction to the jury on the proper consideration of the evidence.

The defendant's only argument on appeal is that the evidence violates Rule 404(b); however, we easily conclude that Evidence Rule 404(b) did not prohibit admission of Twin Gatti's statement, "If you're not Ghost, you gotta get it," or evidence of Mr. Terry's death. Neither of these instances involve any alleged conduct by the defendant, and, consequently, Rule 404(b) does not apply. *See DuBose*, 953 S.W.2d at 653.

As to Investigator Robertson's testimony of the defendant's gang affiliation and association, we conclude that the trial court did not abuse its discretion by admitting the evidence. The trial court complied with the procedural requirements of Rule 404(b), and the record supports the trial court's ruling that the evidence was probative of the defendant's motive. The defendant correctly points out that the State did not present at the motion hearing evidence that the defendant had been arrested for a driving violation, and this evidence was not deemed admissible by the trial court's ruling. The defendant, however, failed to object to its admission at trial, and consequently has waived that issue. *See* Tenn. R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection . . . ."); *State v. Gilley*, 297 S.W.3d 739, 766 (Tenn. Crim. App. 2008) ("This court will not consider a theory of exclusion raised for the first time on appeal" (citations omitted)).

We decline to find plain error in the trial court's admission of the evidence of the defendant's arrest for a driving violation. Other than asking this court to consider plain error relief for any issue deemed waived, the defendant has failed to argue why he merits such relief. *See State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007) ("It is the accused's burden to persuade an appellate court that the trial court committed plain error." (citation omitted)).

-14-

## II.  Sufficiency of the Evidence

Next, the defendant challenges the sufficiency of the evidence as to his conviction of attempted first degree murder, arguing that the State failed to present sufficient evidence to establish his identity as the perpetrator or his intent to commit the offense.  The State argues that the evidence sufficiently supported the jury's verdict.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).  This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact.  *Dorantes*, 331 S.W.3d at 379.  The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence.  *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).  Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.  *Id.*

As relevant here, "First degree murder is . . . a premeditated and intentional killing of another."  T.C.A. § 39-13-202(a)(1).  "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense."  *Id.* § 39-12-101(a)(3).  Additionally, "[t]he identity of the perpetrator is an essential element of any crime."  *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)).  Whether the State has established the defendant as the perpetrator of the charged offenses beyond a reasonable doubt is "a question of fact for the jury upon its consideration of all competent proof."  *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015) (citing *State v. Thomas*, 158 S.W.3d 361 app. at 388 (Tenn. 2005)); *accord State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982) (citing *Stubbs v. State*, 393 S.W.2d 150, 153 (Tenn. 1965)).

Viewed in the light most favorable to the State, the evidence adduced at trial showed that on January 10, 2019, Mr. Harris was rumored to be leaving the Ghost Mob and converting to the Travelers.  That same day, the Travelers were rumored to have killed Ronald Terry, a "very high ranking" member of the Ghost Mob.  In a telephone call with Ghost Mob member Twin Gatti, Mr. Harris was told, "If you're not Ghost, you gotta get

it," which statement he understood to be a threat because of his intent to leave the Ghost Mob. Later that day, Mr. Harris spoke to Jamaine Tipler, a known Ghost Mob member, who was driving a red Chevrolet Silverado in which the defendant, also a known Ghost Mob member, was a passenger. Mr. Tipler told Mr. Harris that he had heard that Mr. Harris had converted to the Travelers, a claim that Mr. Harris denied because he feared that he would be harmed in retaliation for Mr. Terry's death if he was believed to be a Traveler. After that conversation, Mr. Tipler and the defendant followed Mr. Harris around town in the red Silverado. Mr. Tipler and the defendant approached Mr. Harris at the Hays Food Express and, after Mr. Tipler had confirmed that the defendant did not have a gun, ordered the defendant to accompany Mr. Harris home. The defendant rode in Mr. Harris's car to Mr. Harris's apartment and followed him to the back door. As soon as Mr. Harris entered the house, the defendant said, "I got you now, n***a," and shot Mr. Harris multiple times.

This evidence was more than sufficient to establish that the defendant intentionally and with premeditation attempted to kill Mr. Harris and that by shooting him, took a substantial step toward committing that offense. The defendant argues that the only evidence connecting the defendant to the offense was evidence that the defendant was a Ghost Mob member and that the Ghost Mob "premeditated the shooting," alleging that the gang's premeditation was "attributed to" the defendant. This is simply incorrect. Mr. Harris specifically testified that he remembered the defendant following him into his apartment and that he heard the defendant speak immediately before he was shot. The defendant argues that Mr. Harris's testimony was unreliable because he "admit[ted] to having no recollection of the event until months later" and because there were several other "possible suspects." The jury heard and considered all of this evidence, including the challenges to Mr. Harris's credibility, and accredited the State's evidence as was their prerogative. *See State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE